FILED
CLERK, U.S. DISTRICT COURT

SEP 2 7 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2016 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>ERIC PULIER and<br>JON WALDRON,<br><br>        Defendants. | CR No. 17 CR 0 0 5 9 9 -AB<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Securities Fraud and Wire Fraud; 18 U.S.C. § 1348: Securities Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1952(a)(3): Interstate Travel and Use of Interstate Facility in Aid of Commercial Bribery; 18 U.S.C. § 1503(a): Obstruction of Justice; 26 U.S.C. § 7206(1): Filing False Tax Return; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act to be Done; 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(e): Criminal Forfeiture] |

     The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.    ServiceMesh, Inc. ("ServiceMesh") was a privately-held Delaware corporation with headquarters in Santa Monica, California. ServiceMesh was in the business of providing cloud computing management software and services to corporations in the United States and overseas.  ServiceMesh's principal technology was known as the Agility Platform Licensed Software ("Agility Platform"), which enabled enterprises to develop and manage their own information technology and computer networking systems.

2.    Commonwealth Bank of Australia ("CBA") was a publicly-held financial institution with headquarters in Sydney, Australia.  CBA shares traded on the Australian Securities Exchange.  CBA had been a customer of ServiceMesh since approximately 2010 and used the Agility Platform.

3.    Computer Sciences Corporation ("CSC") was a Nevada corporation with headquarters in Falls Church, Virginia.  CSC was a global provider of information technology and professional services. Shares of CSC common stock were registered with the Securities and Exchange Commission ("SEC") under Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78l(b), and were publicly traded on the New York Stock Exchange, a national securities exchange, under the symbol CSC.

4.    Pursuant to the Equity Purchase Agreement entered into on October 29, 2013, later amended on November 15, 2013 ("EPA"), CSC acquired all of ServiceMesh's outstanding shares.  The terms of CSC's acquisition of ServiceMesh included an initial cash payment and other compensation of approximately $163 million, plus a variable incentive

1  payment ("Earnout Payment") based on revenue earned by ServiceMesh

2  during the period from January 1, 2013 to January 31, 2014 ("Earnout

3  Period").  Under the terms of the acquisition, for every $1 in

4  revenue earned by ServiceMesh during the Earnout Period in excess of

5  $20 million, CSC agreed to pay ServiceMesh shareholders $10.15, up to

6  a maximum Earnout Payment of approximately $137 million.

7        5.    Defendant ERIC PULIER ("PULIER") was a resident of Los

8  Angeles, California.  Defendant PULIER was the founder, Chairman

9  of the Board of Directors, Chief Executive Officer, and one of the

10  largest shareholders of ServiceMesh prior to its acquisition by CSC.

11  Defendant PULIER also owned and controlled TechAdvisors LLC, a

12  Delaware corporation ("TechAdvisors").  TechAdvisors owned

13  approximately five percent of outstanding shares of ServiceMesh prior

14  to the CSC acquisition.  TechAdvisors had no other business

15  operations or activity other than its ownership interest in

16  ServiceMesh.

17        6.    Defendant JON WALDRON ("WALDRON") was a resident of Sydney,

18  Australia.  Defendant WALDRON was the General Manager-IT Engineering

19  at CBA.

20        7.    Co-conspirator Keith Robert Hunter ("Hunter") was a

21  resident of Drummoyne, Australia, and the Executive General Manager,

22  Infrastructure and Operations, at CBA.

23        8.    Co-conspirator A was a resident of Beverly Hills,

24  California, and a longtime friend and high school classmate of

25  defendant PULIER.  On or about May 9, 2014, co-conspirator A caused

26  the incorporation of Ace, Inc. in Delaware.  On or about January 14,

27  2015, co-conspirator A changed the name of Ace, Inc. to The Ace

28  Foundation (hereinafter referred to as "ACE").  Co-conspirator A

served as the president and secretary of ACE, and as one of ACE's directors.

9.   Co-conspirator B was a resident of Venice, California, and served as a director of ACE.

10.   ServiceMesh Employee #1 was a resident of Australia and Los Angeles, California.   ServiceMesh Employee #1 was the Vice President, Emerging Market Programs for ServiceMesh.

COUNT ONE

[18 U.S.C. § 1349]

[Defendants PULIER and WALDRON]

11.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 of this Indictment as though fully set forth herein.

A.   THE OBJECTS OF THE CONSPIRACY

12.   Beginning in or about September 2013 and continuing through a date unknown to the Grand Jury, but no earlier than in or about September 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendants PULIER and WALDRON, together with co-conspirator Hunter and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit the following offenses against the United States: (a) securities fraud, in violation of Title 18, United States Code, Section 1348; and (b) wire fraud, in violation of Title 18, United States Code, Section 1343.

B.   THE MANNER AND MEANS OF THE CONSPIRACY

13.   The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

(1)   Defendant PULIER'S Use of TechAdvisors as a Slush Fund to Benefit ServiceMesh and Defendant PULIER

14.   In or about 2008, soon after defendant PULIER incorporated ServiceMesh, defendant PULIER gave membership interests in TechAdvisors to technology industry executives and professionals who had the ability to assist ServiceMesh and defendant PULIER in the development of what became the business of ServiceMesh (the "Friends of Eric").  Specifically, defendant PULIER gave each of the Friends

5

1   of Eric an equity interest in TechAdvisors of approximately 5 to 23

2   percent for a de minimis amount of money.  At the time, defendant

3   PULIER represented to the Friends of Eric that their equity interests

4   in TechAdvisors represented founders shares or equity in what became

5   ServiceMesh.

6        15.  Some of the Friends of Eric were, at the time, or became

7   soon thereafter, senior technology executives at major corporations,

8   including financial institutions and companies in the pharmaceutical

9   and consumer goods industries.  As the business of ServiceMesh grew

10  and matured in 2009 and 2010, many of the corporations at which the

11  Friends of Eric worked became actual or potential customers of

12  ServiceMesh.

13       16.  Beginning soon after defendant PULIER gave equity interests

14  in TechAdvisors to the Friends of Eric, and continuing through

15  October 2011, defendant PULIER caused the Friends of Eric to sign

16  rescission and/or repurchase agreements returning their equity

17  interests in TechAdvisors to defendant PULIER in order to eliminate

18  any explicit conflict of interest for the Friends of Eric in

19  advocating for, and in some instances signing, agreements for the

20  purchase of goods and services on behalf of their employers from

21  ServiceMesh while at the same time owning equity interests in

22  ServiceMesh derivatively through ownership in TechAdvisors.  Later,

23  some Friends of Eric became formal members of a board of advisors or

24  the Board of Directors of ServiceMesh for which they were compensated

25  with the opportunity to purchase equity in ServiceMesh.

26       17.  From in or about September 2008 through 2013, some of the

27  Friends of Eric facilitated, and in some instances signed, contracts

28  for the purchase of goods and services from ServiceMesh on behalf of

their employers.  The business facilitated by the Friends of Eric represented some of the largest and highest profile customers of ServiceMesh and generated millions of dollars of revenue for ServiceMesh.

(2)   Defendant PULIER Develops Close Relationship Between ServiceMesh and CBA

18.   ServiceMesh and defendant PULIER developed a close relationship with CBA after CBA began using ServiceMesh technology and services in or about 2010.  Defendant PULIER ingratiated himself and ServiceMesh to executives at CBA, including defendant WALDRON, through gratuities such as expensive dinners and entertainment, travel to the United States and elsewhere, and proposals of possible future employment or business ventures.  As a result, defendant WALDRON developed close business and personal relationships with defendant PULIER and ServiceMesh Employee #1, both of whom attended the 2012 wedding of defendant WALDRON at which ServiceMesh Employee #1 served as the best man for defendant WALDRON.

19.   Beginning in 2010, as a means of enhancing ServiceMesh's influence with, and sales to, CBA, defendant PULIER sought to enhance defendant WALDRON's influence within CBA by providing consulting services and advice to CBA regarding personnel matters, including the hiring of CBA information technology ("IT") personnel favorably inclined toward ServiceMesh, and the termination of CBA IT personnel who were skeptical of ServiceMesh technology and/or the close relationship between ServiceMesh executives and CBA's IT executives, particularly defendant WALDRON.

20.   In or about 2010 to 2011, defendant PULIER and defendant WALDRON lobbied CBA to hire co-conspirator Hunter as defendant

7

1  WALDRON's supervisor, and arranged for meetings between co-
2  conspirator Hunter, defendants PULIER and WALDRON, and ServiceMesh
3  Employee #1, in order to develop a relationship of trust between
4  defendant WALDRON and co-conspirator Hunter.  For example, on April
5  10, 2011, defendant PULIER sent an email to defendant WALDRON
6  regarding an upcoming dinner to be hosted by ServiceMesh for co-
7  conspirator Hunter.  In the email, defendant PULIER wrote, "The
8  purpose of getting Keith [Hunter] with you earlier (before he gets
9  the job) is to establish you as the go-to guy . . . leave him with a
10  few take-aways: he wants the job, he is not in it alone, there are
11  people at the bank that he can rely upon and trust."

12      21.   On several occasions, in violation of CBA policies,
13  defendant WALDRON shared confidential CBA business information
14  relating to CBA IT budgets and negotiations between CBA and
15  ServiceMesh competitor technology firms with defendant PULIER and
16  ServiceMesh Employee #1 in order to provide ServiceMesh and defendant
17  PULIER with an informational advantage in gaining future business and
18  sales to CBA.

19      (3)   Defendant PULIER and his Co-conspirators Inflate
            ServiceMesh Revenue to Boost Earnout Payment by CSC
20

21      22.   In or about September 2013, the conspirators began efforts
22  to fraudulently inflate ServiceMesh revenue during the Earnout Period
23  through promises by defendant PULIER of the payment of undisclosed
24  payments and/or other future compensation to representatives of
25  ServiceMesh customers, such as CBA, and others who were able to
26  influence ServiceMesh customers to purchase goods and services from
27  ServiceMesh during the Earnout Period.

28

23.   Defendant PULIER devised, and communicated to his co-conspirators, a formula under which defendant WALDRON, co-conspirator Hunter, and others would receive payment of a percentage of certain funds received by defendant PULIER as a result of CSC's acquisition of ServiceMesh in return for assistance in obtaining contracts for the purchase of ServiceMesh goods and services that contributed to any Earnout Payment by CSC to ServiceMesh shareholders, including defendant PULIER.

24.   On or about October 29, 2013, defendant PULIER certified to CSC, as required under Section 4.2(c) of the EPA, that the pipeline of ServiceMesh transactions contemplated by the EPA would not "violate any Law applicable" to defendant PULIER, and that defendant PULIER would not "take any action to cause" this representation "to be untrue in any material respect."  This certification was false in that, as defendant PULIER then well knew, defendant PULIER already intended to bribe defendant WALDRON and co-conspirator Hunter by making payments to them in exchange for them using their positions at CBA to assist ServiceMesh in obtaining contracts with CBA that would increase any Earnout Payment from CSC.

25.   No later than in or about December 2013, defendant PULIER dictated and caused to be reduced to writing a spreadsheet that set out the formula (the "TechAdvisors Allocation Formula") under which defendant PULIER planned to compensate many of the Friends of Eric and others who provided assistance to the business and development of ServiceMesh from proceeds, including a share of the anticipated Earnout Payment, received by TechAdvisors from the acquisition of ServiceMesh by CSC.  Co-defendant WALDRON and co-conspirator Hunter were included among those allocated amounts from the ServiceMesh

1    acquisition using the TechAdvisors Allocation Formula.  At that time,

2    the spreadsheet estimated the payments from the ServiceMesh

3    acquisition to co-defendant WALDRON and co-conspirator Hunter at

4    $1,150,000 and $750,000, respectively.

5        26.  Defendant PULIER, defendant WALDRON, and co-conspirator

6    Hunter sought to cause CBA to purchase goods and services from

7    ServiceMesh in order to inflate ServiceMesh revenue and any Earnout

8    Payment by CSC to ServiceMesh shareholders, including TechAdvisors,

9    and, through the TechAdvisors Allocation Formula, themselves.

10   Specifically, the conspirators sought to cause CBA to purchase, among

11   other things: (a) security software by McAfee, Inc., along with

12   related software and support services by ServiceMesh ("the McAfee

13   Deal"), for upwards of approximately $7 million (AUD); and (b)

14   software, maintenance, and support services including software

15   solutions by Pivotal Software, Inc. ("the Pivotal Deal") for upwards

16   of $7 million (AUD).  To that end, the conspirators touted the

17   purported benefits of the McAfee Deal and the Pivotal Deal to CBA

18   representatives involved in the CBA decision-making process and

19   squelched any dissenting views by representatives within CBA, all the

20   while concealing from CSC and CBA representatives defendant PULIER's

21   agreement to compensate defendant WALDRON and co-conspirator Hunter

22   for their assistance to ServiceMesh and defendant PULIER in inflating

23   ServiceMesh's revenue during the Earnout Period.

24       27.  On or about December 23, 2013, defendant PULIER, defendant

25   WALDRON, and co-conspirator Hunter caused CBA to enter into the

26   following contracts with ServiceMesh in relation to the McAfee Deal:

27

28

a.  Transaction Documents ("TD") 19 and 20 – McAfee Technical Assistance and Residential Support Account Manager: to provide professional services and a full-time resident support account manager, for $28,350 (AUD) and $207,000/year (AUD), respectively.

b.  TD 21 – ServiceMesh Cloud Secure to provide perpetual licenses for McAfee security and related software, three years maintenance services, and support services, for $5,552,410 (AUD), $1,389,123 (AUD), and $65,000 (AUD), respectively.

On or about January 30, 2014, due to concerns related to CSC's revenue recognition policies, TDs 19 and 20 were canceled in order to avoid any impact on the recognition of revenue by CSC from TD 21, which recognition of revenue would affect the Earnout Payment to ServiceMesh.

28.  Defendant PULIER, defendant WALDRON, and co-conspirator Hunter inflated the Pivotal Deal from an initial estimate of approximately $1.5 to $1.8 million (AUD) in December 2013 and early January 2014, to approximately $7 million (AUD) in late January 2014 to offset and make-up for revenue ServiceMesh and defendant PULIER had expected to contribute to any Earnout Payment but that had been lost due to other sales ServiceMesh failed to execute within the Earnout Period.

29.  Defendant PULIER, defendant WALDRON, and co-conspirator Hunter, in order to expedite the execution of the Pivotal Deal so it could occur in time to inflate any Earnout Payment, caused the agreements for the Pivotal Deal to be broken into nine separate contracts, each under $1 million (AUD), so that each contract fell

11

1   under co-conspirator Hunter's signatory authority at CBA.  This also

2   had the effect of circumventing CBA's more stringent procurement

3   policies and procedures for contracts worth approximately $7 million

4   (AUD).

5       30.  On or about January 25, 2014, defendant PULIER, defendant

6   WALDRON, and co-conspirator Hunter caused CBA to enter into the

7   Pivotal Deal, consisting of nine contracts with ServiceMesh, each

8   signed by co-conspirator Hunter on behalf of CBA, for a total of

9   approximately $7 million (AUD), as follows:

10          a.   TD 17 – the Agility Platform for Pivotal Solutions

11  Licensed Software, for a total of $994,500 (AUD);

12          b.   TD 22 – the ServiceMesh System Center Hybrid Cloud

13  Management Pack, for a total of $994,500 (AUD);

14          c.   TD 23 – the Agility Platform OpenShift Ecosystem

15  Solution Licensed Software, for a total of $994,500 (AUD);

16          d.   TD 24 – the Agility Cloud Foundry Platform-as-a-

17  Service Adapter Licensed Software, for a total of $87,750 (AUD);

18          e.   TD 25 – the Agility OpenShift Platform-as-a-Service

19  Adapter Licensed Software, for a total of $87,750 (AUD);

20          f.   TD 26 – the Agility Platform Pivotal GemFire Ecosystem

21  Solution Licensed Software, for a total of $994,500 (AUD);

22          g.   TD 27 – the Agility Platform Pivotal Greenplum

23  Ecosystem Solution Licensed Software, for a total of $994,500 (AUD);

24          h.   TD 28 – the Agility Platform Pivotal SQLFire Ecosystem

25  Solution Licensed Software, for a total of $994,500 (AUD); and

26          i.   TD 29 – the Agility Platform Pivotal RabbitMQ

27  Ecosystem Solution Licensed Software, for a total of $994,500 (AUD).

28

31.   On or about January 30, 2014, defendant PULIER provided CSC with a Letter of Representation regarding post-acquisition revenue for ServiceMesh from November 15, 2013 through January 31, 2014, in which defendant PULIER falsely certified that defendant PULIER and ServiceMesh provided CSC with all information relevant to revenue recognition for the Earnout Period, including any side-agreements that might impact recognition of revenue by CSC.   In fact, as defendant PULIER well knew, defendant PULIER and ServiceMesh had concealed from CSC defendant PULIER's agreement to compensate defendant WALDRON and co-conspirator Hunter for their assistance to ServiceMesh and defendant PULIER in causing CBA to execute the McAfee and Pivotal Deals as a means of inflating ServiceMesh's revenue during the Earnout Period.

32.   On or about February 21, 2014, CSC recognized approximately $10.4 million (USD) in revenue from the McAfee and Pivotal Deals, collectively, which boosted ServiceMesh's revenue during the Earnout Period recognized by CSC to approximately $29.7 million.   Without the approximately $10.4 million in revenue from the McAfee and Pivotal Deals, CSC would not have been obligated under the EPA to make any Earnout Payment to ServiceMesh shareholders.   With the $10.4 million in revenue from the McAfee and Pivotal Deals, CSC agreed that ServiceMesh shareholders qualified under the EPA for an Earnout Payment of 10 times the amount by which the additional revenue recognized by CSC exceeded $20 million, that is, a total of approximately $98 million.

(4)   The Earnout Payment and Bribes Paid to Defendant WALDRON and Co-conspirator Hunter

33.   On or about March 14, 2014, CSC made an Earnout Payment of approximately $98 million to an account of Continental Stock Transfer and Trust at JP Morgan Chase Bank (the "Exchange Agent Account") used to administer payments under the EPA.

34.   On or about March 19, 2014, TechAdvisors, the company controlled by defendant PULIER, received its portion of the Earnout Payment from CSC consisting of a transfer of approximately $5.6 million from the Exchange Agent Account to a TechAdvisors account at CitiBank (the "Citi-Tech Account").

35.   On or about May 9, 2014, defendant PULIER and co-conspirator A caused the incorporation of ACE in Delaware.  The May 9, 2014 Delaware Certificate of Incorporation for ACE represented that its purpose was "to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware."  On or about November 5, 2014, the ACE Certificate of Incorporation was amended to state that its purpose was "consulting services."  The ACE Certificate of Incorporation was further amended to represent that ACE was organized for tax exempt purposes under Section 501(c)(3) of the Internal Revenue Code ("IRS"), including religious, charitable, scientific, literary, and educational purposes.  No application for tax exempt status for ACE was submitted to the IRS at that time or anytime throughout 2014.

36.   Between on or about May 9, 2014 and on or about September 19, 2014, defendant PULIER caused the transfer of a total of $4.85 million (USD) from the Citi-Tech Account to an account of co-conspirator A held at TD Ameritrade (the "TDA-3 Account") and an

14

1   account held at Citibank in the name of ACE (the "Citi-ACE Account"),

2   over which co-conspirator A was the sole signatory.

3      37. Between on or about May 9, 2014 and on or about December

4   15, 2014, defendant PULIER caused co-conspirator A to wire transfer

5   approximately $1.9 million from the Citi-ACE Account and a personal

6   account held by co-conspirator A at Bank of America, within the

7   Central District of California, to accounts of defendant WALDRON at

8   CBA in Sydney, Australia, and ASB Bank ("ASB") in Auckland, New

9   Zealand.

10      38. Between on or about August 7, 2014 and on or about

11   September 23, 2014, defendant PULIER caused co-conspirator A to wire

12   transfer approximately $630,000 from the Citi-ACE Account within the

13   Central District of California, to accounts belonging to co-

14   conspirator Hunter at CBA in Sydney, Australia, and at Bank of

15   America in Texas.

16      39. Between August 2014 and January 2015, defendant PULIER

17   caused co-conspirator A and ACE to make payments of almost $1 million

18   to other technology executives, including a number of the Friends of

19   Eric, who worked for, or consulted with, ServiceMesh customers,

20   including CBA, prior to ServiceMesh's acquisition by CSC.

21      40. Between on or about August 26, 2014 through October 27,

22   2014, defendant PULIER caused co-conspirator A to make payments of

23   approximately $126,000 from the Citi-ACE account to a consultant to

24   ACE engaged in developing a software platform for potential

25   commercial sale to foreign corporations in the financial services and

26   telecommunications industries.

27

28

(5)   <u>Efforts to Conceal the True Purpose of the Payments to
Defendant WALDRON and Co-Conspirator Hunter</u>

41.   In or about October 2014, CBA's Group Security unit learned of anomalous amounts of money transferred into accounts of defendant WALDRON at CBA and ASB from the Citi-ACE Account and a personal account of co-conspirator A at Bank of America, and later discovered anomalous transfers from the Citi-ACE Account to accounts of co-conspirator Hunter at CBA.

42.   On or about December 17, 2014, CBA investigators interviewed defendant WALDRON and co-conspirator Hunter about the payments received from co-conspirator A and ACE.  Both defendant WALDRON and co-conspirator Hunter falsely told CBA investigators that they performed consulting work for ACE in exchange for the payments received from co-conspirator A and ACE.  Co-conspirator Hunter also later provided CBA investigators with false invoices from co-conspirator Hunter to ACE for the purported consulting services provided by co-conspirator Hunter to ACE.  Neither defendant WALDRON nor co-conspirator Hunter had previously reported to CBA any outside consulting work for or the payments from co-conspirator A and ACE directed by defendant PULIER.

43.   On or about December 24, 2014, CBA terminated the employment of defendant WALDRON and co-conspirator Hunter.

44.   Beginning December 29, 2014, defendant PULIER and co-conspirator A sent, and caused to be sent, emails to defendant WALDRON and co-conspirator Hunter that: (a) requested the return of money sent to defendant WALDRON and co-conspirator Hunter; (b) provided false explanations for the request for the return of the money; and (c) provided false information about ACE and its purported

charitable mission to support the false claim that consulting work had been performed, or was to be performed, for ACE by defendant WALDRON and co-conspirator Hunter.  Neither defendant WALDRON nor co-conspirator Hunter returned any money to ACE.

45.  In or about late December 2014 and January 2015, after defendant WALDRON and co-conspirator Hunter were terminated by CBA, other technology executives who received payments totaling approximately $680,00 from ACE at the direction of defendant PULIER returned the funds to ACE and/or did not cash a check received from ACE.

46.  On or about January 14, 2015, defendant PULIER and co-conspirator A caused ACE to change its name from Ace, Inc. to The Ace Foundation.

47.  On or about January 25, 2015, defendant PULIER caused co-conspirator A to sign under penalty of perjury and file with the Internal Revenue Service ("IRS") a Form 1023 Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code on behalf of ACE ("ACE Form 1023").  In the ACE Form 1023, defendant PULIER and co-conspirator A concealed from the IRS the approximately $3.2 million in payments by ACE to defendant WALDRON, co-conspirator Hunter, and others made by co-conspirator A at the direction of defendant PULIER.

48.  On or about March 13, 2015, the New South Wales Crime Commission in Sydney, Australia, obtained a restraining order from the Supreme Court of New South Wales against any funds held by defendant WALDRON and co-conspirator Hunter in their accounts at ASB and CBA, respectively, including funds received from ACE.

49.   On or about March 17, 2015, co-conspirator Hunter was arrested by the New South Wales Police Force in Australia on charges related to his acceptance of bribes paid by defendant PULIER through TechAdvisors and ACE, which charges were widely reported in business news media in Australia and the United States.   On or about March 26, 2015, defendant WALDRON surrendered to the New South Wales Police Force in Australia on charges related to his acceptance of bribes paid by defendant PULIER through TechAdvisors and ACE.

50.   On or about March 17, 2015, the IRS issued a letter to ACE requesting additional information in relation to ACE's application for tax-exempt status ("IRS supplemental request").   The IRS supplemental request inquired about ACE contributions, gifts, and grants to foreign organizations and any safeguards in place at ACE to ensure that any payments by ACE to foreign organizations would be used for tax-exempt purposes under the federal tax laws.

51.   On or about April 10, 2015, co-conspirator A and co-conspirator B requested and participated in a telephone call with a consultant who assisted ACE with the ACE Form 1023 to address an "Urgent Matter."   In the telephone call, co-conspirator B asked the consultant whether "it would be a problem with the IRS if payments were not disclosed" in the ACE Form 1023.   In response to questions about the nature of any undisclosed payments, co-conspirator B represented that payments were sent by ACE to Australia for software development and that there was an ongoing investigation related to defendant PULIER.   In the telephone call, co-conspirator B and co-conspirator A concealed from the consultant the fact that defendant WALDRON and co-conspirator Hunter had been arrested and charged in Australia with accepting bribes in connection with the payments to

18

them by ACE.  Based on the incomplete information provided by co-
conspirator A and co-conspirator B, the consultant advised that ACE
needed to amend its submissions to the IRS to disclose the payments
to Australia.  Co-conspirator A and co-conspirator B did not follow
the advice and ACE never amended its submissions to the IRS to
disclose the payments to defendant WALDRON and co-conspirator Hunter
in Australia.  The IRS ultimately approved ACE's unamended
application for tax-exempt status on or about April 21, 2015.

52.  On or about May 26, 2015, ACE filed a civil complaint
against CBA in Los Angeles County Superior Court, Case No. BC 582962,
in which ACE sought money damages from CBA ("the ACE Complaint").
The ACE Complaint falsely alleged that the payments to defendant
WALDRON and co-conspirator Hunter were advance payments for services
related to software development.  The ACE Complaint further alleged
that CBA threatened to sue defendant WALDRON and co-conspirator
Hunter if they returned funds to ACE, and that CBA caused Australian
law enforcement authorities to freeze the accounts of defendant
WALDRON and co-conspirator Hunter.  On or about March 24, 2016, ACE
dismissed the lawsuit against CBA.

53.  In or about July 2015, co-conspirator A and co-conspirator
B met with an accountant in Santa Monica, California ("ACE Tax
Preparer"), for the purpose of engaging the accountant to prepare an
audit and 2014 tax return for ACE.  At that time, co-conspirator A
and co-conspirator B concealed from the ACE Tax Preparer: (a) that
defendant WALDRON and co-conspirator Hunter had been charged by
Australian authorities with felony bribery-related offenses in
connection with payments by ACE in 2014; and (b) that ACE had
received a federal grand jury subpoena in June 2015 related to the

payments by ACE to defendant WALDRON and co-conspirator Hunter. Subsequently, neither co-conspirator A, co-conspirator B, nor anyone else connected to ACE advised the ACE Tax Preparer of the Australian criminal charges against defendant WALDRON and co-conspirator Hunter, or of the federal grand jury subpoena received by ACE.

54.   On or about September 22, 2015, the ACE Tax Preparer completed and filed a Form 990 Return of Organization Exempt from Income Tax for ACE in which the $2.5 million in payments to defendant WALDRON and co-conspirator Hunter that had been frozen by Australian authorities was identified under "loans and notes receivable, net" in reliance on the purported collectability of funds due to the ACE Complaint against CBA, and the concealment from the ACE Tax Preparer of both the Australian criminal charges against defendant WALDRON and co-conspirator Hunter and the federal grand jury investigation related to the payments by ACE to defendant WALDRON and co-conspirator Hunter.

C.    OVERT ACTS

55.   In furtherance of the conspiracy and to accomplish its objects, on or about the following dates, defendants PULIER and WALDRON, co-conspirator Hunter, co-conspirators A and B, and other co-conspirators known and unknown to the Grand Jury, committed, willfully caused others to commit, and aided and abetted the commission of the following overt acts, among others, within the Central District of California and elsewhere:

Overt Act No. 1:    On or about September 5, 2013, defendant PULIER caused a ServiceMesh executive to represent to CSC executives working on the acquisition of ServiceMesh that "Eric Pulier owns 25%

of ServiceMesh.  The shares of 'TechAdvisors LLC' are not owned by
Eric."

Overt Act No. 2:    On or about September 18, 2013, defendant
WALDRON and co-conspirator Hunter traveled from Sydney, Australia, to
Los Angeles, California, for, among other things, meetings with
defendant PULIER.

Overt Act No. 3:    On or about September 21, 2013, defendant
PULIER met with defendant WALDRON and co-conspirator HUNTER in Los
Angeles.  During the meeting, defendant PULIER discussed a formula
under which defendant PULIER would compensate defendant WALDRON and
co-conspirator Hunter a percentage of funds received in any sale of
ServiceMesh to CSC for assistance provided by defendant WALDRON and
co-conspirator Hunter to ServiceMesh and defendant PULIER.

Overt Act No. 4:    On or about October 31, 2013, a CBA
colleague responded to an inquiry by defendant WALDRON about the
current CBA/McAfee relationship, stating that a prior proposed
contract for the purchase of security software by CBA from McAfee
included a price of $2.4 million.  Defendant WALDRON forwarded the
message containing the details of the prior proposed $2.4 million
contract between CBA and McAfee to ServiceMesh Employee #1 and warned
"FYI.  Confidential."

Overt Act No. 5:    On or about October 31, 2013, defendant
WALDRON sent the message enclosing the details of the prior proposed
$2.4 million contract between CBA and McAfee to co-conspirator Hunter
and stated, "This is what I'm aiming to get thru on SM [ServiceMesh]
paper.  Have checked, and since the licenses are perpetual the full
amount qualifies as in-year revenue.  So here's $7m for them.  It's

now with [ServiceMesh Employee #1] and [defendant PULIER] to sign up a partner agreement with McAfee."

Overt Act No. 6:   On or about November 20, 2013, defendant PULIER discussed with co-defendant WALDRON and co-conspirator Hunter a framework for the Pivotal Deal, which defendant PULIER described as "key to the earn-out."

Overt Act No. 7:   No later than December 8, 2013, defendant PULIER met with a former ServiceMesh executive at a restaurant in Santa Monica, California, and discussed defendant PULIER's obligations to make payments to certain persons, including some of the Friends of Eric, defendant WALDRON, co-conspirator Hunter, and others, from funds received by TechAdvisors as a result of the sale of ServiceMesh to CSC.

Overt Act No. 8:   On or about December 9, 2013, ServiceMesh Employee #1 sent an email to defendant WALDRON indicating that ServiceMesh's proposal for the McAfee Deal would be $8.8 million for three years.   ServiceMesh Employee #1 wrote, ". . . I need to sit down with you and explain what ServiceMesh need [sic] from a rev[enue] rec[ognition] perspective and work through those numbers . . . ."

Overt Act No. 9:   On or about December 17, 2013, a CBA representative asked ServiceMesh Employee #1 for a break-out of the revenue for McAfee products versus ServiceMesh products "in order to valid [sic] this deal as making commercial sense."   Defendant WALDRON, who was copied on the correspondence, replied, "Commercial sense has already been verified . . . Keith and I want this sorted ASAP - within the next 48 hrs."

Overt Act No. 10:   On or about December 19, 2013, defendant WALDRON and co-conspirator Hunter received notice within CBA of final agreement on the terms of the McAfee Deal with ServiceMesh, in response to which defendant WALDRON wrote to co-conspirator Hunter "I think we may have just about pulled this one off?? . . . ," in response to which co-conspirator Hunter responded "Awesome!!!"

Overt Act No. 11:   On or about December 20, 2013, defendant WALDRON wrote to ServiceMesh Employee #1 that "I have sorted the $$ for the Pivotal/Agility TD.  It will be $1.5m, which I will pay." Defendant WALDRON further wrote that he reached agreement on the scope of the Pivotal TD with another ServiceMesh executive "so we should be able to land that one easily enough."  In response, ServiceMesh Employee #1 quipped "Great... We should put you on the payroll."  To which defendant WALDRON responded "Hopefully, I already am! :)"

Overt Act No. 12:   On or about December 21, 2013, while in Los Angeles, California, defendant WALDRON received confirmation from defendant PULIER that defendant PULIER intended to pay defendant WALDRON approximately $1.5 million.

Overt Act No. 13:   On or about December 23, 2013, ServiceMesh Employee #1 sent an email from his ServiceMesh email account to representatives of CBA enclosing executed signature pages for the three TDs 19, 20, and 21 that comprised the McAfee Deal.

Overt Act No. 14:   On or about January 5, 2014, ServiceMesh Employee #1 sent an email from his ServiceMesh email account to the CBA email account of defendant WALDRON enclosing draft TDs 17 and 22 for the Pivotal Deal totaling approximately $1.8 million (AUD).

1      Overt Act No. 15:   On or about January 24, 2014, ServiceMesh
2   Employee #1 sent an email from his ServiceMesh email account to
3   defendant WALDRON at his CBA email account enclosing nine finalized
4   TDs, 17 and 22 through 29, for the Pivotal Deal totaling
5   approximately $7 million (AUD).

6      Overt Act No. 16:   On or about January 24, 2014, co-conspirator
7   Hunter, on behalf of CBA, signed-off on TDs 17 and 22-29 as part of
8   the Pivotal Deal with ServiceMesh.

9      Overt Act No. 17:   On or about March 10, 2014, defendant
10   WALDRON wrote to defendant PULIER "[c]an you, I and Keith meet in San
11   Fran on afternoon Thur 3 Apr and the morning Fri 4 Apr to discuss
12   next steps?"

13      Overt Act No. 18:   On or about March 19, 2014, defendant
14   WALDRON sent an email to defendant PULIER that included the following
15   question about the status of defendant WALDRON's expected payment
16   from defendant PULIER via TechAdvisors, "[h]as there been any
17   progress from David [defendant PULIER's attorney] re TA
18   [TechAdvisors]?"

19      Overt Act No. 19:   On or about March 20, 2014, defendant PULIER
20   circulated via email a schedule titled "TA Allocations_v5.xlsx" to
21   attorneys involved in settling financial disputes involving payments
22   owed by TechAdvisors, including payments owed to some of the Friends
23   of Eric.

24      Overt Act No. 20:   On or about April 9 through April 12, 2014,
25   defendant PULIER, defendant WALDRON, and co-conspirator Hunter met in
26   Santa Monica, California, and discussed the TechAdvisors Allocation
27   Formula under which defendant PULIER intended to pay defendant

28

WALDRON and co-conspirator Hunter for their assistance in obtaining the Earnout Payment from CSC.

Overt Act No. 21:   On or about April 12, 2014, defendant WALDRON sent a text message to ServiceMesh Employee #1 that stated, "$$ landed.  Keith disappointed."  ServiceMesh Employee #1 responded, "Not good.  Did Keith get some time with him."  Defendant WALDRON responded, "Yes.  Keith [Hunter] at $750K.  But to be fair to Eric, it is actually more than the formula.  He was just hoping Eric would top it up to $1m."  ServiceMesh Employee #1 replied, "$750k is a lot of money!"

Overt Act No. 22:   On or about April 18, 2014, defendant PULIER caused the transfer from the Citi-Tech Account to the account of a former ServiceMesh executive of approximately $2.9 million to settle financial disputes relating to TechAdvisors, which included approximately $1,450,000 and $800,000, respectively, to settle obligations to two Friends of Eric.

Overt Act No. 23:   On or about April 21, 2014, defendant WALDRON wrote to defendant PULIER the following message: "Assuming we're going with PNC LLC now, is there any concern around what can be paid out in a single transaction?  Because I am going to need to draw down the delta between K and me upfront, so that whatever gets left in the non-profit is the same as what K has left, for when he is involved.  Given that, I'd need to submit a SOW with a schedule consisting of a payment of approx. $1.05m (that's $250k each for K and me + the $550k delta between my $1.3m and K's $750k.  Like you, I am keen to disburse funds out of TA as soon as we can."

Overt Act No. 24:   On or about May 9, 2014, defendant PULIER caused the transfer of approximately $100,000 from the Citi-Tech Account to the TDA-3 Account.

Overt Act No. 25:   On or about May 9, 2014, co-conspirator A opened the Citi-ACE account at Citibank.   In the Citibank Business Deposit Account Application, co-conspirator A represented that ACE was engaged in "Computer Programming, Software, Services and Software Development," and in response to the question whether Ace was a "Not for Profit/Non-Government Organization" checked the box marked "No."

Overt Act No. 26:   On or about May 9, 2014, co-conspirator A attempted to wire transfer $100,000 from his TDA-3 account to an account of defendant WALDRON at CBA, but was denied by TD Ameritrade compliance personnel.

Overt Act No. 27:   On or about May 14, 2014, co-conspirator A transferred approximately $100,000 from his TDA-3 account to another account of co-conspirator A at Bank of America, from which co-conspirator A sent a wire transfer the next day of approximately $100,000 to an account of defendant WALDRON at CBA.

Overt Act No. 28:   On or about May 28, 2014, defendant WALDRON transferred approximately $19,980 from an account he maintained at HIFX Limited, doing business as CurrencyOnline.com in Auckland, New Zealand, to the account of a relative of co-conspirator Hunter at Wells Fargo Bank in the United States.

Overt Act No. 29:   On or about June 25, 2014, defendant PULIER caused the transfer of approximately $1,250,000 from the Citi-Tech Account to the Citi-ACE Account.

1    Overt Act No. 30:   On or about July 28, 2014, defendant PULIER
2  and co-conspirator A caused the transfer of $200,000 from the Citi-
3  ACE Account to an account of defendant WALDRON at CBA.

4    Overt Act No. 31:   On or about July 29, 2014, co-conspirator A
5  sent an email message to a personal email account of defendant PULIER
6  enclosing an invoice for ACE for the purported sale to TechAdvisors
7  of $1,250,000 in services identified as "3,000 Data architecture
8  services" and "550 Project consulting services."

9    Overt Act No. 32:   On or about August 7, 2014, defendant PULIER
10  and co-conspirator A caused the transfer of approximately $330,000
11  from the Citi-ACE Account to an account of co-conspirator Hunter at
12  Bank of America in Texas.

13    Overt Act No. 33:   On or about August 27, 2014, defendant
14  PULIER and co-conspirator A caused the transfer of approximately
15  $150,000 from the Citi-ACE Account to an account of co-conspirator
16  Hunter at CBA.

17    Overt Act No. 34:   On or about September 19, 2014, defendant
18  PULIER caused the transfer of approximately $3,500,000 from the Citi-
19  Tech Account to the Citi-ACE Account.

20    Overt Act No. 35:   On or about September 23, 2014, defendant
21  PULIER and co-conspirator A caused the transfer of approximately
22  $150,000 from the Citi-ACE Account to an account of co-conspirator
23  Hunter at CBA.

24    Overt Act No. 36:   On or about September 30, 2014, defendant
25  PULIER and co-conspirator A caused the transfer of approximately
26  $203,647.41 from the Citi-ACE Account to a former consultant to CBA
27  who was instrumental in the relationship between ServiceMesh and CBA
28  prior to the acquisition of ServiceMesh by CSC, which funds were

1   later returned to ACE after news of defendant WALDRON and co-
2   conspirator Hunter's terminations at CBA became known.

3       Overt Act No. 37:   On or about September 22, 2014, defendant
4   WALDRON opened a new bank account in his own name at ASB in New
5   Zealand, with account number ending x1649 (the "WALDRON ASB
6   Account").

7       Overt Act No. 38:   On or about November 3, 2014, defendant
8   PULIER and co-conspirator A caused the transfer of approximately
9   $300,000 from the Citi-ACE Account to an account of defendant WALDRON
10  at CBA.

11      Overt Act No. 39:   On or about November 10, 2014, defendant
12  PULIER and co-conspirator A caused the transfer of approximately
13  $300,000 from the Citi-ACE Account to the WALDRON ASB Account, with a
14  beneficiary identified as Digisol Services.

15      Overt Act No. 40:   On or about December 8, 2014, defendant
16  PULIER and co-conspirator A caused the transfer of approximately
17  $350,000 from the Citi-ACE Account to the WALDRON ASB Account, with a
18  beneficiary named Digisol Services.

19      Overt Act No. 41:   On or about December 15, 2014, defendant
20  PULIER and co-conspirator A caused the transfer of approximately
21  $350,000 from the Citi-ACE Account to the WALDRON ASB Account, with a
22  beneficiary named Digisol Services.

23      Overt Act No. 42:   On or about December 17, 2014, CBA
24  investigators scheduled interviews of defendant WALDRON and co-
25  conspirator Hunter regarding payments they received from ACE.   Prior
26  to the interviews, co-conspirator Hunter wrote to defendant WALDRON
27  "I am so shocked I want to vomit. I can not believe we were Tis [sic]
28  stupid."   Co-conspirator Hunter continued, "List direct answer What

1    we know.   We share no more then [sic] we have to nothing besides

2    that…"

3         Overt Act No. 43:   On or about December 22, 2014, co-

4    conspirator Hunter sent an email to a member of CBA's Group Security

5    unit that included a copy of a false Statement of Work, dated August

6    22, 2014, for purported consulting services provided by co-

7    conspirator Hunter to ACE for $150,000 in fees.

8         Overt Act No. 44:   On or about December 24, 2014, defendant

9    PULIER and co-conspirator A caused ACE to make payment of

10   approximately $477,000 in the form of check number 1064 from the

11   Citi-ACE account to the consulting firm of a former senior technology

12   executive of a financial institution that was a large customer of

13   ServiceMesh, which check went uncashed after news of the terminations

14   of defendant WALDRON and co-conspirator Hunter at CBA became known.

15        Overt Act No. 45:   On or about December 31, 2014, co-

16   conspirator A sent an email to co-conspirator HUNTER in which co-

17   conspirator A falsely stated that ACE "advanced" money to co-

18   conspirator Hunter for future consulting services to ACE, and

19   reiterated a request that co-conspirator Hunter return the money

20   previously sent by co-conspirator A to co-conspirator Hunter.

21        Overt Act No. 46:   On or about January 2, 2015, defendant

22   PULIER made a telephone call to a former executive at ServiceMesh

23   with whom defendant PULIER previously settled a financial dispute

24   related to TechAdvisors and the Friends of Eric, and asked the former

25   executive at ServiceMesh to "get rid" of all communications

26   concerning the settlement of their dispute related to TechAdvisors,

27   which would have included copies of the spreadsheet based on the

28

TechAdvisors Allocation Formula that had been exchanged between the two of them.

Overt Act No. 47:   On or about January 3, 2015, co-conspirator A sent an email to co-conspirator Hunter reiterating his request for the return of funds sent by ACE to co-conspirator Hunter, and enclosing a false summary description of ACE's purported charitable mission and operations.

Overt Act No. 48:   On or about January 5, 2015, defendant PULIER sent an email message to defendant WALDRON and co-conspirator Hunter in which defendant PULIER requested the return of funds sent by ACE to defendant WALDRON and co-conspirator Hunter and falsely described the purpose of the payments as for "projects and future deliverables."

Overt Act No. 49:   On or about April 8, 2015, co-conspirator A, on behalf of ACE, signed under penalty of perjury and caused to be submitted to the IRS a written response to the March 17, 2015 IRS supplemental request for information.   In the response, co-conspirator A represented that ACE "does not make loans, grants, or issue cash to either foreign or domestic organizations" and that ACE did "not have contracts or close connections with any other foreign organizations at this time," while concealing from the IRS the fact that in 2014 ACE had direct and indirect agreements with foreign organizations and had made over $3 million in payments to foreign persons and organizations, including payments to defendant WALDRON and co-conspirator Hunter.

Overt Act No. 50:   On or about May 26, 2015, co-conspirator B, on behalf of ACE, approved the filing of the ACE complaint, which co-conspirator B then well knew omitted the fact that defendant WALDRON

1  and co-conspirator HUNTER had been arrested and charged by the
2  Australian authorities with accepting bribes in connection with the
3  payments to them by ACE.

COUNT TWO

[18 U.S.C. §§ 1348, 2]

[Defendants PULIER and WALDRON]

56.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 13 through 55 of this Indictment as though fully set forth herein.

57.   Beginning in or about September 2013, and continuing through a date unknown to the Grand Jury, but no earlier than September 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendants PULIER and WALDRON, together with others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud a person in connection with the securities of CSC, and to obtain money and property in connection with purchases and sales of the securities of CSC by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts, as described in paragraphs 13 through 55 of this Indictment.

COUNTS THREE THROUGH SIX

[18 U.S.C. §§ 1343, 2]

[Defendants PULIER and WALDRON]

58.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 13 through 55 of this Indictment as though fully set forth herein.

A.   THE SCHEME TO DEFRAUD

59.   Beginning no later than in or about September 2013, and continuing through a date unknown to the Grand Jury, but no earlier than in or about September 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendants PULIER and WALDRON, together with others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud CSC and its shareholders as to material matters, and to obtain money and property from CSC and its shareholders by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts, as described in paragraphs 13 through 55 of this Indictment.

B.   USE OF THE WIRES

60.   On or about the dates set forth below, within the Central District of California and elsewhere, defendants PULIER and WALDRON and their co-schemers, aiding and abetting each other, for the purpose of executing and attempting to execute the above-described scheme to defraud, transmitted and caused the transmission of the following items by means of wire communication in interstate and foreign commerce:

| COUNT | DATE | WIRE TRANSMISSION |
|-------|------|-------------------|
| THREE | 5/15/2014 | Transfer of approximately $100,000 from a Bank of America account of co-conspirator A, within the Central District of California, to an account of defendant WALDRON at CBA in Sydney, Australia |
| FOUR | 8/7/2014 | Transfer of approximately $330,000 from the Citi-ACE Account, within the Central District of California, to an account of co-conspirator HUNTER at Bank of America in Texas |
| FIVE | 12/8/2014 | Transfer of approximately $350,000 from the Citi-ACE Account, within the Central District of California, to the WALDRON ASB Account in Auckland, New Zealand |
| SIX | 12/15/2014 | Transfer of approximately $350,000 from the Citi-ACE Account, within the Central District of California, to the WALDRON ASB Account in Auckland, New Zealand |

COUNTS SEVEN THROUGH TWELVE

[18 U.S.C. §§ 1952(a)(3), 2]

[Defendant PULIER]

61.  The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 13 through 55 of this Indictment as though fully set forth herein.

62.  On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant PULIER willfully caused others to travel in interstate and foreign commerce, and used, and willfully caused to be used, and aided and abetted the use of, the mail and any facility in interstate and foreign commerce as described below, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, commercial bribery in violation of California Penal Code Section 641.3, and thereafter performed and attempted to perform and caused the performance of an act to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment and carrying on of such unlawful activity as follows:

| COUNT | DATE | TRAVEL IN INTERSTATE AND FOREIGN COMMERCE AND USE OF FACILITY OF INTERSTATE AND FOREIGN COMMERCE |
|---|---|---|
| SEVEN | 9/18/2013 | Travel by defendant WALDRON on Qantas Airlines from Kingsford Smith Airport in Sydney, Australia, to Los Angeles, International Airport in Los Angeles, California, for, among other things, meetings with defendant PULIER. |
| EIGHT | 9/18/2013 | Travel by co-conspirator Hunter on Qantas Airlines from Kingsford Smith Airport in Sydney, Australia, to Los Angeles, International Airport in Los Angeles, California, for, among other things, meetings with defendant PULIER. |

| COUNT | DATE | TRAVEL IN INTERSTATE AND FOREIGN COMMERCE AND USE OF FACILITY OF INTERSTATE AND FOREIGN COMMERCE |
|---|---|---|
| NINE | 1/24/2014 | Email from CBA account of defendant WALDRON in Sydney, Australia, to the ServiceMesh account of ServiceMesh Employee #1 in the Central District of California, enclosing signature pages for the Pivotal Deal TDs. |
| TEN | 4/9/2014 | Travel by co-conspirator Hunter on Qantas Airlines from Kingsford Smith Airport in Sydney, Australia, to Los Angeles, International Airport in Los Angeles, California, for, among other things, meetings with defendant PULIER. |
| ELEVEN | 7/28/2014 | Wire transfer of approximately $200,000 from the Citi-ACE Account, within the Central District of California, to an account of defendant WALDRON at CBA in Sydney, Australia. |
| TWELVE | 9/23/2014 | Wire transfer of approximately $150,000 from the Citi-ACE Account, within the Central District of California, to an account of co-conspirator Hunter at CBA in Sydney, Australia. |

COUNT THIRTEEN

[18 U.S.C. § 1503(a)]

[Defendant PULIER]

63.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 13 through 55 of this Indictment as though fully set forth herein.

64.   On or about May 18, 2016, in Los Angeles County, within the Central District of California and elsewhere, defendant PULIER corruptly endeavored to influence, obstruct, and impede the due administration of justice, namely, a federal grand jury investigation of securities fraud, wire fraud, and other offenses in relation to the acquisition of ServiceMesh by CSC in November 2013, by corruptly endeavoring to influence a witness, a former ServiceMesh executive, to provide false information to the Federal Bureau of Investigation ("FBI") and a federal grand jury.  In particular, among other things, in a covertly recorded meeting between defendant PULIER and a former executive of ServiceMesh, defendant PULIER asked the former ServiceMesh executive:

        a.   "if you were aware that [Friend of Eric 1] and [Friend of Eric 2] were gonna get a bribe for-for being our customers, that's not a good thing . . . if that's your thing, then you're gonna say that and put me in jail . . . , but it's better . . . uh . . . if you believe as I do . . . that they were not bribed.  They'll come after you just as they";

        b.   "all I can ask of you . . . is don't tell them [the FBI and Grand Jury] that I bribed them";

        c.   "if they have an expectation that the money was gonna be for something, anything, that some legitimate thing that they did

37

1   . . . and you're saying that they did something legitimate . . .

2   that's everything.   It saves my life";

3        d.   "I really wanted to talk to you. I had a fantasy . . .

4   a hope . . . that your position would be that you did not believe

5   that anyone on that list [TechAdvisors Allocation Formula] was gonna

6   get paid for past uh, deeds"; and

7        e.   "what I really want is-is to ask you if you would

8   express that you don't think I bribed anybody."

COUNT FOURTEEN

[26 U.S.C. § 7206(1)]

[Defendant PULIER]

65.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 13 through 55 of this Indictment as though fully set forth herein.

66.   On or about October 19, 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendant PULIER, a resident of Los Angeles County, California, within the Central District of California, willfully made and subscribed, by a written declaration verifying that he was doing so under penalty of perjury, and filed with the Internal Revenue Service, a materially false U.S. Individual Income Tax Return, Form 1040, for the calendar year 2014, which defendant PULIER did not believe to be true and correct as to every material matter, in that the tax return reported itemized deductions totaling $8,207,398 on line 40, including $4,993,718 in gifts to charity reported in lines 16 and 19 of Schedule A, whereas, as defendant PULIER then knew and believed, the "gifts to charity" reported by defendant PULIER included the payment of approximately $4,850,000 by defendant PULIER from his closely held company, TechAdvisors, to ACE, which payment was used not for charitable purposes but to make bribe payments to defendant WALDRON and co-conspirator Hunter, and to make additional payments to other persons for non-charitable purposes.

COUNT FIFTEEN

[26 U.S.C. § 7206(1)]

[Defendant PULIER]

67.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 13 through 54 of this Indictment as though fully set forth herein.

68.   On or about September 21, 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendant PULIER, a resident of Los Angeles County, California, within the Central District of California, willfully made and subscribed, by a written declaration verifying that he was doing so under penalty of perjury, and filed with the Internal Revenue Service, a materially false U.S. Return of Partnership Income, Form 1065, for TechAdvisors for the calendar year 2014, which defendant PULIER did not believe to be true and correct as to every material matter, in that the tax return reported a charitable contribution of $4,850,500 at Schedule K, line 13(a) representing money contributed by TechAdvisors to ACE, whereas, as defendant PULIER then knew and believed, defendant PULIER had caused ACE to use more than $2.5 million of the funds contributed by TechAdvisors to ACE to make payments to defendant WALDRON and co-conspirator Hunter in exchange for Earnout Payment revenue, as well as caused ACE to make additional payments to other persons for non-charitable purposes.

1                          FORFEITURE ALLEGATION

2              [18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c)]

3         1.    Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is

4    hereby given to defendants PULIER and WALDRON, that the United States

5    will seek forfeiture as part of any sentence in accordance with Title

6    18, United States Code, Section 981(a)(1)(C) and Title 28, United

7    States Code, Section 2461(c), in the event of any defendant's

8    conviction under Counts One through Fourteen of this Indictment.

9         2.    Any defendant so convicted shall forfeit to the United

10   States the following property:

11             (a)   All right, title and interest in any and all property,

12   real or personal, constituting, or derived from, any proceeds

13   obtained, directly or indirectly, as a result of the offense; and

14             (b)   To the extent such property is not available for

15   forfeiture, a sum of money equal to the total value of the property

16   described in subparagraph a.

17        3.    Pursuant to Title 21, United States Code, Section 853(p),

18   as incorporated by Title 18, United States Code, Section 982(b) and

19   Title 28, United States Code, Section 2461(c), any defendant so

20   convicted shall forfeit substitute property, up to the total value of

21   the property described in the preceding paragraph if, as the result

22   of any act or omission of the defendant, the property described in

23   the preceding paragraph, or any portion thereof: (a) cannot be

24   located upon the exercise of due diligence; (b) has been transferred,

25   sold to or deposited with a third party; (c) has been placed beyond

26   //

27   //

28   //

1    the jurisdiction of the court; (d) has been substantially diminished

2    in value; or (e) has been commingled with other property that cannot

3    be divided without difficulty.

4                                          A TRUE BILL

5

6                                          /S/

7                                          Foreperson

8    SANDRA R. BROWN
     Acting United States Attorney
9

10

11   LAWRENCE S. MIDDLETON
     Assistant United States Attorney
12   Chief, Criminal Division

13   GEORGE S. CARDONA
     Assistant United States Attorney
14   Chief, Major Frauds Section

15   STEPHEN A. CAZARES
     Assistant United States Attorney
16   Deputy Chief, Major Frauds Section

17   SCOTT PAETTY
     Assistant United States Attorney
18   Major Frauds Section

19

20

21

22

23

24

25

26

27

28